**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| AGILENT TECHNOLOGIES INC., | |
| Plaintiff, | |
| v. | Civil Action No.: |
| | **JURY TRIAL DEMANDED** |
| J&X TECHNOLOGIES CO., LTD., | |
| Defendant. | |

## ORIGINAL COMPLAINT

Plaintiff Agilent Technologies, Inc. ("Plaintiff" or "Agilent") brings this complaint of patent infringement, trade secret misappropriation under the Defend Trade Secrets Act and the Delaware Uniform Trade Secrets Act, and a declaration of rightful ownership of U.S. Patent Application No. 15/884,360.

## NATURE OF THE ACTION:

1.      This is an action for: (i) infringement of United States Patent No. 8,277,544 ("the '544 Patent") under the Patent Laws of the United States, 35 U.S.C. § 1 et seq.; (ii) trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b); (iii) trade secret misappropriation under the Delaware Uniform Trade Secrets Act, 6 Del. C. § 2001, *et seq.*; and (iv) declaration of rightful ownership of U.S. Patent Application No. 15/884,360 by operation of law.

2.      Agilent seeks damages, injunctive relief, and declaratory relief under 35 U.S.C. § 281 et seq., 18 U.S.C. § 1836 (b)(3), and 28 U.S.C. § 2201.

## THE PARTIES

3.      Agilent is a Delaware corporation with its principle place of business at 5301

Stevens Creek Blvd., Santa Clara, California 95051.

4.      Upon information and belief, Defendant J&X Technologies (Shanghai) Co., Ltd. ("Defendant" or "J&X") is a foreign corporation incorporated in Shanghai, China, with its principal place of business at 1599 Jungong Road, Yangpu District, Shanghai, China 200438.

## JURISDICTION

5.      This Court has subject matter jurisdiction over the patent infringement claim pursuant to 28 U.S.C. §§ 1331 and 1338(a), because the action concerns the infringement of a United States patent.

6.      This Court has subject matter jurisdiction over the Defend Trade Secrets Act claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), because the action arises under the Defend Trade Secrets Act.

7.      This Court has subject matter jurisdiction over the declaration of rightful ownership claim pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2201 because the action arises under 35 U.S.C. § 261.

8.      This Court has subject matter jurisdiction over the Delaware Uniform Trade Secrets Act claim pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000 and the matter is between citizens of a State and citizens or subjects of a foreign state.  This Court also has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1367, because this claim is so related to other claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

9.      On information and belief, J&X is subject to this Court's specific personal jurisdiction, at least because J&X committed acts of patent infringement in Texas and this judicial district and J&X purposefully availed itself of the privileges of doing business in Texas and in this

judicial district.

10.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because J&X is a foreign company and not a resident in the United States and J&X is subject to personal jurisdiction in this judicial district.

## THE PATENT-IN-SUIT

11.   Agilent is the owner by assignment of United States Patent No. 8,277,544 ("the '544 Patent"), entitled "THERMAL MODULATION DEVICE FOR TWO DIMENSIONAL GAS CHROMATOGRAPHY," which the U.S. Patent and Trademark Office duly issued on October 2, 2012. The U.S. Patent and Trademark Office issued the '544 Patent in full compliance with Title 35 of the United States Code. The '544 Patent is valid and enforceable.  A true and correct copy of the '544 Patent is attached hereto as Exhibit 1.

## FACTUAL BACKGROUND

### A.   Agilent and its Trade Secrets

12.   Agilent is a world-leading research, development, and manufacturing company whose laboratory products and services target the food, environmental and forensics, pharmaceutical, diagnostics, chemical and energy, and research markets, among others. Agilent's solutions enable its customers to address global trends that impact human health and the environment and to anticipate future scientific needs. Its innovative technologies provide scientists and healthcare workers tools to fight cancer, improve quality of life, and enable new discoveries. Agilent was established in 1999, when it was spun off from Hewlett-Packard.  Headquartered in Santa Clara, California, Agilent and its subsidiaries employ approximately 15,500 people across its 32 offices, worldwide.

13.   One of Agilent's business divisions focuses on developing and marketing gas

chromatography ("GC") equipment. Agilent's GC division is headquartered and managed in Wilmington, Delaware. Gas chromatography equipment is used to determine the constituents of a mixture by passing a gaseous sample through a column packed with a chemical substrate that interacts with the differing sample constituents based on their differing chemical properties. These differences result in a variable retention of the constituents such that they exit the column at different times and can then be individually analyzed by an attached detector. Several industries use gas chromatography to test for contamination or ensure a process stability.

14.     Agilent supplies its GC solutions to customers in energy, chemical, environmental, food service, forensic, and pharmaceutical industries, among others. Agilent has invested millions of dollars in developing GC technology, including the technology underlying the causes of action in this case. Agilent's investment has earned Agilent the industry-leading position in the global GC market.

15.     As part of its investment in GC, Agilent develops new and improved devices for its customers. The new products and processes developed at Agilent and its subsidiaries are proprietary to Agilent and are trade secrets unless and until they are made public, and, even then, aspects remain trade secrets. Agilent has developed these trade secrets by investing extensive resources in research, development, training, testing, and experimentation. The trade secrets have included the designs for GC devices and modulators, technical drawings for such devices, and software running those devices.

16.     Much of the value in Agilent's technology is driven by its innovative solutions to customer needs. While certain aspects of Agilent's technology can be reverse engineered when a product is released to the public, other aspects constitute trade secrets, including but not limited to Agilent's proprietary GC technology that has not yet been marketed or sold to customers and has

not otherwise been made public. The trade secrets provide substantial competitive advantage in the marketplace by enabling Agilent to be the first to enter the marketplace with its new and improved products as part of a coordinated product-release strategy.

### 1.     Agilent's Thermal-Independent-Modulator

17.     A team of scientists working at Agilent (Shanghai) Co., LTD. ("Agilent Shanghai"), a wholly-owned Agilent subsidiary located in Shanghai, China, developed a thermal modulator for GC applications after years of research and development.  The thermal modulator they developed was a compact device designed to work with existing Agilent GC systems to aid in separation.

18.     Xiaosheng Guan, Qiang Xu, Hai Jiang, and Zhijun Zhao worked as engineers for Agilent Shanghai. Messrs. Guan, Xu, Jiang, and Zhao began their employment at Agilent Shanghai around March 1, 2007, January 21, 2008, March 15, 2007, and June 23, 2011 respectively. As a team, these individuals worked primarily to develop GC-related technologies. Mr. Guan held the title of "Expert," Mr. Xu held the title of "Instrument Engineer," Mr. Jiang held the title of "Electrical Engineer," and Mr. Zhao held the title of "Physical Chemist."

19.     Mr. Guan, Mr. Xu, and other Agilent Shanghai employees focused on developing GC and modules at Agilent Shanghai until they left in January 2015. During their employment at Agilent Shanghai, Messrs. Guan and Xu had extensive access to confidential aspects of Agilent's GC technology and to other confidential business information about Agilent's current and future products.

20.     Messrs. Guan and Xu are the named inventors on Agilent's '544 Patent.

### 2.     The Agilent Patent and the Analytical Chemistry publication

21.     On March 26, 2010, Agilent filed U.S. Patent Application No. 12/732,288, naming

Messrs. Guan and Xu as the two inventors.  The application issued as the '544 Patent on October 2, 2012.

22.     The '544 Patent discloses a novel thermal modulation device (also known as thermal independent modulator ("TIM")) for use in two-dimensional GC systems. Two-dimensional GC (2D-GC, also sometimes referred to as GCxGC) systems include two columns arranged in series, with different properties to allow for improved separation. 2D-GC systems use a modulator to regulate gas flow from the exit of the primary column to the head of the secondary column.

23.     The '544 Patent describes a modulation device located outside the oven of a GC system and including a cold zone located between two hot zones. By causing a capillary tube to move within the modulator, varying lengths of the capillary tube are located in the first and second hot zones separated by the cold zone.

24.     One improvement of the '544 Patent over the prior art is reduced bulk and power consumption, as compared to a conventional thermal modulator located inside the GC oven. The modulator claimed in the '544 Patent also improves performance over prior art modulators.

25.     In August 2016, the journal, *Analytical Chemistry*, published an article entitled "Thermal Independent Modulator for Comprehensive Two-Dimensional Gas Chromatography." The authors included Mr. Guan as well as other authors from: Agilent Shanghai, Dow Chemical Canada ULC, the Australian Center for Research on Separation Science, the ARC Training Center for Portable Analytical Separation Technologies (at the University of Tasmania), and Trajan Scientific and Medical. The article described the use of a modulator "as described in U.S. patent #8277544 [the '544 patent], with a number of modifications." The article included a picture and diagrams of the Agilent thermal modulator but did not disclose the trade secrets misappropriated

by J&X, as discussed below.

### 3. Trade Secrets, and Messrs. Guan's and Xu's involvement in development.

26.    After the development of the TIM disclosed in the '544 patent, Agilent Shanghai continued to refine and improve the TIM design. Mr. Guan and Mr. Xu were heavily involved in the TIM device refinements. Over the four years following the application that led to the '544 patent, Agilent Shanghai made significant TIM design improvements. These modifications increased the TIM's effectiveness, increased its durability, and reduced the overall size of the design. Agilent Shanghai and Agilent kept the details of the modified and improved TIM design a secret and did not disclose them to others.

27.    In addition to the details of new TIM design that was in development, Agilent Shanghai and Agilent also have maintained detailed Computer Aided Design ("CAD") drawings of their GC products as secrets. Although some aspects of products sold to customers are visible by inspection, detailed CAD drawings of those products provide a competitive advantage, because access to these drawings would allow substantial savings of time and cost to produce similar designs. These CAD drawings are confidential and proprietary to Agilent and are trade secrets.

28.    Agilent has taken reasonable steps to protect the trade secrets. Agilent requires employees who have access to confidential, proprietary, or trade secret information to agree not to disclose that information. Further, employees agree to assign any inventions or intellectual property developed in the course of their employment to Agilent. Agilent maintains a policy and practice of labeling confidential documents.  Agilent trains its employees, both upon hiring and periodically thereafter, on the importance of maintaining confidentiality of documents and information and the proper administration of the measures put in place to maintain that confidentiality. Agilent also has onboarding and off-boarding processes for employees with access

to confidential information. Furthermore, the physical premises where these trade secrets at issue in this case were developed and kept require valid employee badges for entry into the building. And the laboratory in which Messrs. Guan and Xu worked had an additional and more-restrictive badge access control. The computers that store Agilent's trade secrets require unique log in and password access provided only to necessary individuals. Agilent enters into nondisclosure agreements with third parties who will receive access to its confidential information, including actual and prospective customers, vendors, and partners.

29.     Agilent and Agilent Shanghai kept the details of the new TIM technology as trade secrets while they were in the possession of Agilent and Agilent Shanghai.

30.     While Messrs. Guan and Xu worked at Agilent Shanghai, the details of Agilent's developmental TIM module were not public. Agilent Shanghai developed the trade secrets concerning the TIM module in-house, through iterative research to solve the problems associated with the TIM.

31.     Agilent and Agilent Shanghai did not release a product implementing the trade secrets in the marketplace.

32.     Furthermore, in the absence of misappropriation, Agilent's trade secrets were incapable of being discovered lawfully.

33.     Agilent's trade secrets derive independent economic value from their secrecy. The trade secrets solve certain problems concerning a modulator, among other things, that would provide economic advantage against others who do not otherwise have access to the trade secret information.

34.     As with its other employees, Agilent Shanghai required that Messrs. Guan, Xu, Jiang, and Zhao sign respective Employment Contracts. In addition to the Employment Contracts,

each of Messrs. Guan, Xu, Jiang, and Zhao signed an "Agilent Service Invention and Information Non-disclosure Agreement ("Confidentiality Agreement") with Agilent Shanghai. Under the Confidentiality Agreement, "[a]ll the work products obtained by [an employee] when it performs its essential job duties during the employment with [Agilent Shanghai], including, but not limited to, all reports, information, drawings, computer programs, ideas and models, shall be the property of" Agilent Shanghai. The work product includes any inventions and discoveries conceived or completed independently by an employee or collectively by the employee and others, related to research, development or business activities of Agilent Shanghai, or obtained by the employee when performing the work of Agilent Shanghai while the employee is employed by Agilent Shanghai.

35.    Through a confidential agreement between Agilent and Agilent Shanghai, the ownership of intellectual property and the right to sue on that intellectual property, which includes the rights under the agreements mentioned above, flows to Agilent.

36.    In their Employment Agreements, Messrs. Guan and Xu also agreed to be obligated to keep the confidentiality of all business secrets that they accessed while working at Agilent and not disclose them either personally or via others.

37.    In the Confidentiality Agreements, Messrs. Guan and Xu agreed that: "a. [they] will use such information to complete the work assigned by [Agilent Shanghai]; b. [they] will keep such information confidential; and c. [they] will take all reasonable precautions no matter during or after expiration of the period of employment with [Agilent Shanghai], in order to ensure that such information will neither be disclosed to unauthorized persons, nor be used without authorization."

38.    The Confidentiality Agreement also covered "inventions (whether or not the patent

rights are available), design, copyrighted works, templates, improvements, data, process, computer programs, and software (hereinafter referred to as 'Proprietary Developments') conceived or completed by [an employee] independently or with others during [the employee]'s employment with [Agilent Shanghai], related to [Agilent Shanghai]'s R&D or business activities, or obtained by [the employee] during the period it completes [Agilent Shanghai]'s work. Such Proprietary Developments shall be the sole property of [Agilent Shanghai], and [the employee] agrees to: a. disclose them to [Agilent Shanghai] immediately; b. declare that they belong to [Agilent Shanghai]; and c. enter into and execute various documents, and at the same time, assist [Agilent Shanghai] to complete various formalities, in order to obtain protection of patent rights, copyrights, templates and/or trade secrets in various countries, at the expense of [Agilent Shanghai]."

39.     Also pursuant to the Confidentiality Agreement, Messrs. Guan and Xu agreed that they would not take any property of Agilent Shanghai out of the working area of Agilent Shanghai without obtaining permission from Agilent Shanghai.

40.     Additionally, pursuant to the Confidentiality Agreements, Messrs. Guan and Xu agreed that, after their employment terms expired, they would return all property of Agilent Shanghai unless as otherwise agreed in writing by Agilent Shanghai.

### 4.     Defendant J&X Technology

41.     Around January 2015, Messrs. Guan, Xu, Jiang, and Zhao's employment with Agilent Shanghai concluded.

42.     Upon information and belief, Messrs. Guan, Xu, Jiang, and Zhao are co-founders and co-owners of Defendant J&X, and they formed J&X soon after the end of their employment at Agilent Shanghai. Upon information and belief, Mr. Xu is the chief scientist at J&X.

43.     In October 2015, Mr. Guan, acting on behalf of J&X, approached Agilent to request

a license to the Agilent '544 Patent to sell GC modules practicing the '544 Patent in the United States. Mr. Guan explained that he "ha[d] been evaluating comprehensive 2D-GC market potential" and was "interested in commercialization" of the '544 patent. Agilent declined to grant a license to the '544 patent.

44.     Upon information and belief, J&X entered the global two-dimensional GC market, including in the U.S.  Also upon information and belief, at some time during or since 2015, J&X posted a marketing brochure on the internet that identified Patrick Laine with Process Mercury in Houston Texas as its "U.S. and Europe representative."  *See* Exhibit 2.

B.     **Misappropriation by Use**

45.     Upon information and belief, in an effort to bypass the significant research and investment necessary to compete with the established industry leaders and jumpstart their business, Messrs. Guan, Xu, Jiang, and Zhao improperly retained Agilent's trade secret technical documents and design information relating to the new TIM design as well as confidential CAD files of existing and in-development products, and Messrs. Guan and Xu provided them to J&X.

46.     Agilent never gave Mr. Guan, Mr. Xu, Mr. Jiang, Mr. Zhao, or J&X permission to retain, possess, use, or disclose Agilent's trade secrets.  Messrs. Guan, Xu, Jiang, and Zhao, acting on behalf of J&X, knew that they did not have permission to disclose or use Agilent's trade secrets after they left Agilent Shanghai.

47.     J&X used Agilent's trade secrets to develop a thermal modulator, which J&X marketed at least under the model name "Solid State Modulator 1800" or "SSM1800." Agilent's trade secrets provided an unfair advantage to J&X's new business, enabling J&X to enter the global GC market with its thermal modulator – that implements Agilent's trade secrets – and to do so more quickly than it could have without the trade secrets.

48.     As shown and described in J&X's SSM1800 manual and other promotional materials, many of the features of the SSM1800 modulator were developed at Agilent or its subsidiaries, including at least the column arm, shape of the column guide, and use of graphite rollers.  Upon information and belief, Messrs. Guan and Xu and their team developed most of the features of J&X's SSM1800 modulator at Agilent Shanghai, and Messrs. Guan and Xu used that information on behalf of J&X.

49.     On May 14–19, 2017, J&X participated in the International Symposium on Capillary Chromatography and GCxGC Symposium ("ISCC & GCxGC") at the Hilton Fort Worth in Fort Worth, Texas. At the symposium, J&X had a display booth where it showed its modulator as a "convenient upgrade from 1D GC to GCxGC."  J&X also displayed a sample of its modulator. Upon information and belief, the modulator on display was the SSM1800 shown in the photo taken at the J&X booth at ISCC & GCxGC, below.



50.     Upon information and belief, the physical product displayed by J&X at the trade show in Fort Worth, Texas embodied Agilent's trade secrets.

51.     J&X's unauthorized use of Agilent's trade secrets enabled J&X to enter into market faster than it would have been able to without the trade secrets and to benefit unfairly from Agilent's investment in GC technologies, including by development cost savings.

C.     **Misappropriation by Disclosure**

52.     Moreover, J&X disclosed additional trade secrets in a patent application submitted to U.S. Patent and Trademark Office and to the State Intellectual Property Office in China.

53.     On or about January 30, 2018, J&X submitted U.S. Patent Application Number 15/884,360 ("the '360 Application"), etitled "COMPREHENSIVE 2DGC SYSTEM

COMPRISING OF A MODULATION COLUMN, A MODULATOR, AND A GAS CHROMATOGRAPH," to the United States Patent and Trademark Office. The '360 Application named Messrs. Guan and Xu as the inventors and was published by the U.S. Patent and Trademark Office on September 13, 2018 as Publication Number 2018/0259493. A copy of the '360 Application publication is attached here as Exhibit 3.

54.    Furthermore, upon information and belief, J&X disclosed substantially the same information in Chinese patent application number 201710154579.0, to which the '360 Application claims priority, to the Chinese State Intellectual Property Office on or about March 13, 2017.

55.    The '360 Application includes details of improvements to the two-dimensional GC system that Messrs. Guan and Xu and their team developed while they were employed by Agilent Shanghai. Agilent owned this information and, before J&X's unauthorized disclosure of it, kept it as a trade secret.

56.    J&X also disclosed certain of the trade secrets in its technical manuals published on its website. For example, the document entitled "SSM1800 Solid State Modulator for Comprehensive Two Dimensional Gas Chromatography (GC×GC) Installation and Operation," which is available for download from J&X's website (at http://www.jnxtec.com/SSM1800?_l=en (last accessed Sep. 10, 2019)), discloses details of the modulator and reveals some of Agilent's trade secrets. Similarly, a document title "Modulation Column Installation Step-by-Step," dated July 30, 2017 (available on J&X's website at http://www.jnxtec.com/ModulationColumn InstallationGuide?_l=en (last accessed Sep. 10, 2019)), discloses details of the internal design of the modulator and discloses Agilent's trade secrets.

57.    Furthermore, upon information and belief, J&X has sold its thermal modulator, which embodies, and therefore discloses, Agilent's trade secrets, at least to customers in Europe.

58.     J&X's disclosure of Agilent's trade secrets destroyed the secrecy of the trade secrets and deprived Agilent of their value.

59.     Further, J&X destroyed the secret status of Agilent's trade secrets, when J&X marketed, sold, offered for sale, and/or imported products embodying Agilent's trade secrets, because these trade secrets then could be reversed engineered by examining the physical product.

### COUNT 1 – MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA

60.     Paragraphs 1 through 59 are incorporated herein by reference.

61.     This is a cause of action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), based on the misappropriation of Agilent's trade secret information through wrongful acquisition, use, and/or disclosure.

62.     Agilent's proprietary GC information was a trade secret because the information drove independent economic value, actual or potential, from not being known generally to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information, and Agilent has taken reasonable measures to keep such information secret.

63.     Agilent is the owner of proprietary GC information as the term defined in 18 U.S.C. § 1839(4).

64.     Agilent's proprietary GC information is embodied in J&X's products that are used in, or intended for use in, interstate and/or foreign commerce.

65.     Messrs. Guan and Xu gained access to Agilent's proprietary GC trade secret information in the course of an employee-employer relationship with Agilent Shanghai. They were under an obligation to maintain the secrecy of Agilent's trade secret information obtained during their employment with Agilent Shanghai.

66.     In violation of their obligations to maintain the secrecy of Agilent's proprietary GC information, they disclosed the information to J&X.

67.     J&X gained access to proprietary GC information by accepting it from Messrs. Guan and Xu, knowing that they improperly acquired and/or disclosed it.

68.     J&X misappropriated Agilent's trade secrets when it acquired the trade secrets and knew or had reason to know that the trade secrets were acquired by improper means.

69.     J&X also misappropriated Agilent's trade secrets when it used and/or disclosed the trade secrets without express or implied consent of Agilent.

70.     Upon information and belief, because Messrs. Guan and/or Xu were founders of J&X, J&X (at the time of disclosure and/or use) knew or had reason to know that the knowledge of the trade secrets was: (1) derived from or through a person who had used improper means to acquire the trade secrets; (2) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and/or (3) derived from or through a person who owed a duty to Agilent and/or Agilent Shanghai to maintain the secrecy of the trade secret or limit the use of the trade secret.

71.     On information and belief, J&X used and/or disclosed Agilent's proprietary GC information maliciously and in willful and conscious disregard of the rights of Agilent.

72.     As a direct and proximate result of J&X's willful, improper, and unlawful use and disclosure of Agilent's proprietary GC information, Agilent suffered actual loss.

73.     As a direct and proximate result of J&X's willful, improper, and unlawful use and disclosure of Agilent's proprietary GC information, J&X was unjustly enriched, and it enjoyed and continues to enjoy an unfair competitive advantage in Agilent's expense. J&X will continue to be unjustly enriched unless enjoined from further use of Agilent's trade secrets.

74.     These acts of J&X of wrongfully misappropriating Agilent's proprietary GC information were and continue to be willful and malicious, warranting an award of exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C) and an award of attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D).

## COUNT 2 – MISAPPROPRIATION OF TRADE SECRETS UNDER DELAWARE UNIFORM TRADE SECRETS ACT

75.     Paragraphs 1 through 74 are incorporated herein by reference.

76.     This is a cause of action for misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. § 2001, *et seq.*, based on the misappropriation of Agilent's proprietary GC information through wrongful acquisition, use, and/or disclosure.

77.     A cause of action for misappropriation of trade secrets under DUTSA is proper because Delaware is the forum with the most significant relationship to the cause of action.  Agilent is a Delaware Corporation, and Agilent's GC division is headquartered in and managed from Wilmington, Delaware.

78.     Agilent's proprietary GC information was a trade secret because the information drove independent economic value, actual or potential, from not being known generally to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, and Agilent has taken reasonable measures to keep such information a secret.

79.     Agilent is the owner of the proprietary GC information.

80.     Messrs. Guan and Xu gained access to Agilent's proprietary GC information in the course of an employee-employer relationship with Agilent Shanghai. They were under an obligation to maintain the secrecy of Agilent's trade secret information obtained during their employment with Agilent Shanghai.

81.     In violation of their obligations to maintain the secrecy of Agilent's proprietary GC information, they disclosed Agilent's proprietary GC Information to J&X.

82.     J&X gained access to proprietary GC information by accepting it from Messrs. Guan and Xu, knowing that they improperly acquired and/or disclosed it.

83.     J&X misappropriated Agilent's trade secrets when it acquired the trade secrets when it knew or had reason to know that the trade secrets were acquired by improper means.

84.     J&X also misappropriated Agilent's trade secrets when it used and/or disclosed the trade secrets without express or implied consent of Agilent.

85.     J&X, at the time of disclosure and/or use, knew or had reason to know that the knowledge of the trade secret was: (1) derived from or through a person who had used improper means to acquire the trade secret; (2) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and/or (3) derived from or through a person who owed a duty to Agilent Shanghai and/or Agilent to maintain the secrecy of the trade secret or limit the use of the trade secret.

86.     On information and belief, J&X was willful and malicious when it misappropriated Agilent's proprietary GC information.

87.     As a direct and proximate result of J&X's willful, improper, and unlawful use and disclosure of Agilent's proprietary GC information, Agilent suffered actual loss.

88.     As a direct and proximate result of J&X's willful, improper, and unlawful use and disclosure of Agilent's proprietary GC information, J&X was unjustly enriched, and it enjoyed and continues to enjoy an unfair competitive advantage at Agilent's expense.  J&X will continue to be unjustly enriched unless enjoined from further use of Agilent's trade secrets.

89.     These acts of J&X in wrongfully misappropriating Agilent's proprietary GC

information were and continue to be willful and malicious, warranting an award of exemplary damages, as provided by 6 Del. C. § 2003(b), and an award of attorneys' fees, as provided by 6 Del. C. § 2004.

<b><u>COUNT 3 – PATENT INFRINGEMENT</u></b>

90.     Paragraphs 1 through 89 are incorporated herein by reference.

91.     As described above, technical manuals for the SSM1800 product are available for download from the J&X website at http://www.jnxtec.com/SSM1800?_l=en.   These manuals describe the function and operation of the SSM1800 Modulator.

92.     The SSM1800 infringes at least claim 1 of the '544 Patent.

93.     As shown in Figure 1.1 of the SSM1800 Installation and Operations Manual (downloaded from the J&X website above), the SSM1800 is a thermal modulation device for a GC system that comprises a cold zone located outside of a GC oven in the GC system, comprising a thermoelectric cooler assembly:



**Figure 1.1 Schematic structure of SSM1800**

94.     The SSM1800 further comprises a first hot zone (labeled "Hot Zone (Entry)" in Figure 1.1) with a corresponding first heat source adjacent a first side of the cold zone.

95.     The SSM1800 further comprises a second hot zone (labeled "Hot Zone (Exit)" in Figure 1.1) with a corresponding second heat source adjacent a second side of the cold zone.

96.     As shown below in Figure 1.2 of the SSM1800 Installation and Operations Manual, the SSM1800 further comprises a flexible capillary column comprising a first segment configured to move between the first hot zone and the cold zone (shown in Figure 1.2 in red and moving between the Hot Zone (Entry) and the Cold Zone), and a second segment configured to move between the cold zone and the second hot zone (shown in black moving between the Cold Zone and the Hot Zone (Exit)).



**Figure 1.2 Motion of the modulation column in SSM1800**

97.     J&X has infringed at least claim 1 of the '544 Patent, at least by importing into the United States and into this District the SSM1800 device displayed on May 14–19, 2017 at the ISCC & GCxGC trade show, located at the Hilton Fort Worth in Fort Worth, Texas.

98.     As described above, J&X was fully aware of the '544 patent at least because two of its founders are the named inventors of the '544 Patent.

99.     J&X also was aware at least as early as October, 2015 that it would require a license to the '544 Patent in order to offer the SSM1800 in the United States.

100.     J&X did not obtain a license prior to importing or offering for sale the SSM1800.

101.     Accordingly, J&X's infringement of the '544 Patent was willful.

**COUNT 4 – DECLARATION THAT AGILENT OWNS THE '360 APPLICATION**

102.     Paragraphs 1 through 101 are incorporated herein by reference.

103.     Messrs. Guan and Xu conceived and developed inventions disclosed and claimed in the '360 Application while employed by Agilent Shanghai. As discussed above, both Mr. Guan and Mr. Xu agreed that any inventions they developed while they were employed at Agilent Shanghai were properly owned by Agilent Shanghai. The Confidentiality Agreements include language of present ownership, such that Agilent (Shanghai) was the owner of all inventions,

including the invention disclosed in the '360 Application. Pursuant to a confidential agreement between Agilent (Shanghai) and Agilent, Agilent is the present owner of these rights.

104.   Despite Agilent's ownership of the inventions, Mr. Guan and Mr. Xu purported to assign the '360 Application to J&X.

105.   J&X had no right to file the '360 Application and claim ownership of inventions that were developed by employees of Agilent and its subsidiaries, using the resources of Agilent and its subsidiaries, and which were maintained as trade secrets by Agilent and its subsidiaries. Moreover, pursuant to the Confidentiality Agreements, Messrs. Guan and Xu had no ownership interest in the invention that they could assign to J&X.

106.   Therefore, Agilent seeks a Declaratory Judgment that Agilent is the owner of any intellectual property created, including any inventions made, by Messrs. Guan and Xu during the course of their employment with Agilent (Shanghai), including the '360 Application, by operation of law.

107.   Alternatively, Agilent seeks a permanent injunction requiring J&X Technologies to assign to Agilent all right, title, and interest in the '360 Application and in any other patent applications that were based on work performed by employees of Agilent or its subsidiaries.

**PRAYER FOR RELIEF**

Wherefore, Agilent respectfully requests the following relief:

a.   judgment that J&X is liable on all causes of action;

b.   judgment that J&X has infringed the '544 Patent literally and/or under the doctrine of equivalents and that the infringement was willful;

c.   an order requiring J&X to account for all gains, profits, and advantages derived from their misappropriation of Agilent's confidential, proprietary and/or trade

secret information;

     d.     an order requiring J&X to disgorge all profits earned from its unlawful conduct, together with restitution to Agilent arising from J&X's unlawful conduct;

     e.     an order awarding actual damages according to proof;

     f.     an order awarding exemplary damages to the extent allowed by law and in an amount according to proof;

     g.     an order awarding pre-judgment and post-judgment interest;

     h.     an order awarding attorneys' fees, costs, and expenses;

     i.     preliminary and permanent injunctive relief pursuant to which J&X, and its employees, officers, directors, and/or representatives, and all persons acting in concert or participating with them are ordered, enjoined, or restrained, directly or indirectly, by any means whatsoever, as follows:

          i.     from manufacturing, making, distributing, marketing, offering to sell or selling products that utilize, embody, or were developed using Agilent's proprietary GC information;

          ii.     from disclosing or using any of Agilent's trade secret or other proprietary or confidential information or information derived therefrom anywhere;

          iii.     from offering to sell or selling to anyone, anywhere, any products that use any Agilent's trade secret or other proprietary or confidential information;

          iv.     immediately preserving and returning to Agilent: (i) all copies of all Agilent's and its subsidiaries' documents and proprietary or confidential information acquired directly or indirectly from Agilent or Agilent Shanghai; and (ii) all copies of all materials (in paper, electronic, or any other form) containing

any, or derived from any of Agilent's trade secrets or other confidential or proprietary information;

v.      a declaration that Agilent is the owner, by operation of law, of U.S. Patent Application No. 15/884,360, and any other related patent applications; and

j.      any and all other relief that the Court Deems just and proper.

## JURY DEMAND

108.    Agilent requests a trial by jury on all issues so triable.

Dated: September 11, 2019                    Respectfully submitted,

                                            REED SMITH LLP

                                            /s/ Mark L. Johansen
                                            Mark L. Johansen (SBN 10670240)
                                            E-mail: mjohansen@reedsmith.com
                                            2501 N. Harwood St., Suite 1700
                                            Dallas, TX 75201
                                            Telephone: (469) 680-4214
                                            Facsimile: (214) 965-7799

                                            Peter J. Chassman (SBN 00787233)
                                            (*Pro hac vice application to be filed*)
                                            E-mail: pchassman@reedsmith.com

                                            Michael J. Forbes (SBN 24074217)
                                            (*Pro hac vice application to be filed*)
                                            E-mail: mforbes@reedsmith.com

                                            Suite 1700
                                            811 Main Street
                                            Houston, TX  77002-6110
                                            Telephone: (713) 469-3800
                                            Facsimile: (713) 469-3899

                                            Counsel for Plaintiff

US_ACTIVE-147998165